## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 31 2017, 12:30 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT,
D.P.

R. Patrick Magrath
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana


ATTORNEY FOR APPELLANT,
R.P.

Jennifer A. Joas
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of K.P., B.P., and R.P. (Children),<br><br>and,<br><br>D.P. (Mother) and R.P. (Father),<br><br>*Appellants-Respondents,* | October 31, 2017<br><br>Court of Appeals Case No. 15A01-1704-JT-901<br><br>Appeal from the Dearborn Circuit Court<br><br>The Honorable James D. Humphrey, Judge<br><br>Trial Court Cause No. 15C01-1610-JT-17 15C01-1610-JT-18 15C01-1610-JT-19 |

v.

The Indiana Department of Child
Services,

*Appellee-Petitioner.*

**Barnes, Judge.**

# Case Summary

R.P. ("Father") and D.P. ("Mother") appeal the termination of their parental rights to their children, Ro.P. and B.P. Mother's also appeals the termination of her parental rights to her child K.P. We affirm in part and reverse in part.

# Issues

The issues before us are:

I.   whether there is sufficient evidence to support the termination of Mother's parental rights; and

II.  whether there is sufficient evidence to support the termination of Father's parental rights.

# Facts

Father and Mother were never married, but they had a long-term, live-in relationship. Ro.P. was born in 2010, and B.P. was born in 2013. Sometime

thereafter, Father and Mother split up. Mother retained custody of the children, while Father paid child support and had regular weekly visitation. Mother began a relationship with A.P. ("Stepfather"), and K.P. was born in 2014.

On February 5, 2015, the Dearborn County Office of the Department of Child Services ("DCS") filed a petition alleging that Ro.P., B.P., and K.P. were children in need of services ("CHINS"). The petition was filed after Stepfather overdosed on heroin in the presence of the children. Mother asserted she was unaware of Stepfather's drug usage. The CHINS petition contained no allegations regarding Father. At the time this case was initiated, Father had an infant daughter with his then-fiancée. No CHINS petition was filed with regard to this child.

On May 4, 2015, the trial court entered an order finding that the children were CHINS. The children were not removed from Mother's care. The CHINS dispositional order required, among other things, that Mother and Stepfather enroll and participate in home-based counseling, complete a parenting assessment and complete any recommendations resulting from it, complete a substance abuse assessment and follow any resulting treatment recommendations, submit to random drug screens, and undergo psychological evaluations. These requirements did not apply to Father—indeed, Father was not referred to any type of program or counseling.

[6]     Mother was resistant to participating in home-based services, contending that only Stepfather used drugs and was at fault for the CHINS finding. In October 2015, DCS caseworker Quinn Webb had difficulty locating Mother and eventually learned she was in Kentucky with the children. On November 4, 2015, Mother tested positive for methamphetamine. DCS thereafter filed a petition to modify the CHINS dispositional decree. On December 8, 2015, the trial court modified the dispositional decree, removing the children from Mother's care. Eventually, all three children were placed in foster care with Ro.P. and B.P.'s paternal aunt.

[7]     After the children were removed from her care, Mother frequently tested positive for illegal or unprescribed drugs, including buprenorphine, fentanyl, cocaine, and methamphetamine. Mother was referred for a substance abuse assessment and then completed a recommended one-day outpatient treatment program. However, the assessment and recommendation were based on self-reporting, and it appears Mother failed to report that she had tested positive for methamphetamine. Mother then was referred to an intensive outpatient treatment program, which she attended sporadically. On March 1, 2016, the trial court held Mother in contempt for Mother's failure to consistently attend the treatment program and for missing several appointments with her homebased counselor. She also missed numerous drug screens.

[8]     On May 23, 2016, Mother was arrested after going with Stepfather to Ohio to purchase heroin. She was jailed in Dearborn County until July 14, 2016. After her release, she continued missing drug treatment sessions and testing positive

for buprenorphine and methamphetamine. In September 2016, Mother was arrested for maintaining a common nuisance and operating a vehicle while intoxicated; the substance she was intoxicated by was heroin. She was in jail for these offenses until February 2, 2017.

[9] During the CHINS proceedings, Father initially continued visiting regularly with the children. Until early 2016, all of the trial court's review hearing orders stated that Father was fully compliant with the CHINS case plan. However, at some point law enforcement began investigating Father for child molestation, based on an alleged incident that had occurred approximately ten years earlier, when Father was fourteen or fifteen years old, and which involved an unidentified eight-year-old. This investigation was the reason why the children were not placed with Father after their removal from Mother. On March 4, 2016, Father pled guilty to one count of Class C felony child molesting by fondling and was sentenced to a term of eight years suspended to probation.[1] One of the conditions of Father's probation stated, "You shall have no contact with any person under the age of 16 unless you receive court approval or successfully complete a court-approved sex offender treatment program, pursuant to IC 35-38-2-2.4. Contact includes face-to-face, telephonic, written,

---

[1] It is unclear why Father was convicted of a criminal offense for conduct that allegedly occurred while he was a juvenile. Documents related to that prosecution are not readily available on either the Mycase or Odyssey case management systems.

electronic, or any indirect contact via third parties." Ex. 24. The condition did not expressly include or exclude Father having contact with his own children.

[10] DCS terminated visitation between Father and his children because of the no contact order. DCS contacted the prosecutor's office about removing this probation condition, but it was not removed. Shortly after pleading guilty, Father violated this condition by having contact with his infant daughter. Father did not think this condition applied to contact with his own children. On March 28, 2016, Father admitted to violating his probation, and two years of his suspended sentence were revoked. As Father was leaving the courtroom following this revocation, he committed an act amounting to trafficking with an inmate. This led to a second probation violation finding on April 14, 2016, and revocation of an additional two years and 180 days of Father's suspended sentence.

[11] At a CHINS review hearing on April 13, 2016, Father asked that he not be transported to any future hearings because of his incarceration. However, Father subsequently told Webb that he wanted to work toward reunification with his children. While Father was in the Dearborn County Jail, DCS referred him to a local "Father Engagement" program. Tr. p. 27. Father participated in this program until he was transferred to a Department of Correction ("DOC") prison—the Plainfield Correctional Facility. This prison does not offer a sex offender treatment program. The record is unclear as to Father's current expected release date. At one point during the termination hearing, Father testified that it was in June 2018; later, he said it was in June 2019. The

"Offender Locator" feature on the DOC's website lists his "Projected Release Date" as June 9, 2018.

[12] On October 24, 2016, DCS filed a petition to terminate Father's parental rights to Ro.P. and B.P., and Mother's parental rights to those two children and K.P.[2] The trial court held fact-finding hearings on January 19 and February 6, 14, and 28, 2017. At the last hearing, the paternal aunt of Ro.P. and B.P. expressed her willingness to adopt those children and K.P. She also testified that she and her husband would consider the possibility of future visitation between the children and Father and Mother, after consultation with mental health professionals.

[13] On March 23, 2017, the trial court entered an order with findings terminating Father and Mother's parental rights to Ro.P. and B.P. and Mother's parental rights to K.P. The trial court specifically found, "There is a reasonable probability that continuation of the parent-child relationship poses a threat to the well-being of the child . . . ." Father's App. p. 26. It did not find that the conditions leading to the children's removal would not be remedied. Father and Mother now appeal.

## Analysis

[14] Both parents challenge the sufficiency of the evidence supporting the termination of their parental rights. The Fourteenth Amendment to the United

---

[2] DCS also sought and obtained termination of Stepfather's parental rights to K.P. Stepfather does not appeal that determination.

States Constitution protects the traditional right of parents to establish a home and raise their children. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). "Indeed the parent-child relationship is 'one of the most valued relationships in our culture.'" *Id.* (quoting *Neal v. DeKalb County Div. of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003)). We recognize that parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities.'" *Id.* (quoting *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*). Courts need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. *Castro v. State Office of Family & Children,* 842 N.E.2d 367, 372 (Ind. Ct. App. 2006), *trans. denied*. "Rather, when the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of the parent-child relationship is appropriate." *Id.*

[15] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re I.A.*, 934 N.E.2d at 1132. We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique

opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)). Here, the trial court entered findings of fact and conclusions thereon in granting DCS's petition to terminate Father and Mother's parental rights. When reviewing findings of fact and conclusions thereon entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[16] Indiana Code Section 31-35-2-8(a) provides that, "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1234 (Ind. 1992).

### *I. Mother*

[17]  The evidence as to Mother and Father is quite different, and we will analyze them separately. Here, the trial court found that continuation of the parent-child relationship posed a threat to the children, and Mother appeals that finding. When considering whether there is sufficient evidence to support such a finding, trial courts must "consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 152 (Ind. 2005). "At the same time, however, a trial court should judge a parent's fitness to care for his child as of the time of the termination proceeding, taking into consideration evidence of changed conditions." *Id.*

[18]  The children were removed from Mother's care after she took them to Kentucky, then returned to Indiana, and tested positive for methamphetamine. Over the next year, Mother repeatedly tested positive for various illegal or unprescribed drugs. She also missed a large number of drug screens and was

held in contempt for failing to participate in intensive outpatient treatment. She had three drug-related arrests during that time frame as well. She was in jail for the last two arrests until shortly before the second of the four termination hearings. Evidently, Mother finally admitted to Webb shortly before that hearing that she had a problem and wanted to address it, and had enrolled in a treatment program.

[19] However, the trial court was entitled to look at Mother's pattern of conduct and determine it was unlikely she could or would remedy her drug problem in the near future. That problem had led to the children being taken away from her, and she lost the means to care for them through her criminal acts. The trial court was not required to accept that Mother's last-minute change of heart would be permanent. There was sufficient evidence that continuation of the parent-child relationship posed a threat to the children's well-being. *See In re A.K.*, 924 N.E.2d 212, 221 (Ind. Ct. App. 2010) (holding there was sufficient evidence continuation of parent-child relationship posed a threat based on parent's inability to remain drug free, manage mental illness, and maintain stable housing), *trans. dismissed*; *In re D.L.*, 814 N.E.2d 1022, 1030 (Ind. Ct. App. 2004) (holding there was sufficient evidence continuation of parent-child relationship posed a threat where it was unlikely parent would remedy her drug problem), *trans. denied*.

[20] This same evidence supports the conclusion that termination of Mother's parental rights is in her children's best interests. *See In re A.K.,* 924 N.E.2d at 221. "A parent's historical inability to provide adequate housing, stability and

supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." *Castro*, 842 N.E.2d at 374. The law allows for termination of parental rights when parties are unable or unwilling to meet their responsibility as parents. *Id.* There is sufficient evidence that such is the case here with respect to Mother.

## II. Father

[21] The evidence with respect to termination of Father's parental rights is more challenging. The CHINS allegations were strictly focused upon Mother and Stepfather's alleged drug abuse; no allegations were made against Father. Father continued visiting regularly with and paying support for the children during the CHINS proceedings, at least until such time as the investigation into a decade-old allegation of child molesting when Father was a teenager became public knowledge. The CHINS dispositional decree required nothing of Father. There has never been any evidence or claim that Father acted improperly toward any of his children, or harmed them, or neglected them in any way. Although Father, immediately after his incarceration, expressed a wish not to be present for any future CHINS hearings, he later told Webb that he eventually wanted to be reunified with his children. Father participated in a DCS-referred "Father Engagement" program in the Dearborn County Jail until his transfer to prison, where it does not appear that program was available. At the time of the termination hearings, the children were in the custody of their paternal aunt,

who intended to seek adoption of all of them and to permit contact between Father and the children in the future.

[22] The only roadblock to Father's reunification with his children is, of course, his conviction for Class C felony child molesting, the probation condition absolutely prohibiting him from having any contact with anyone under sixteen years old, and his violation of that term and resulting incarceration—followed immediately by his second probation violation for trafficking with an inmate. This is, admittedly, a substantial roadblock. But, we cannot conclude that these circumstances by themselves establish that continuation of the parent-child relationship between Father and his children poses a threat to their well-being.

[23] We first note, there are certain criminal convictions that will prima facie support a finding that there is a reasonable probability that continuation of the parent-child relationship poses a threat to the well-being of the child. Ind. Code § 31-35-3-8. One such conviction is child molesting, but only if the victim was the person's biological or adoptive child, or the child of a spouse of that person. I.C. § 31-35-3-4(1)(G), (2). Clearly, Father's offense did not fall under this category. Thus, the mere fact of Father's conviction did not support termination of his parental rights.

[24] Moreover, the offense of which Father was convicted was committed many years before his oldest child was even conceived. There is no evidence or claim that this offense was part of a pattern of criminal conduct against younger children, or that Father has engaged in any such conduct since that time, when

he was fourteen or fifteen years old. This weighs considerably against a finding that continuation of the parent-child relationship posed a threat to Father's children's well-being. *See In re G.Y.*, 904 N.E.2d 1257, 1262 (Ind. 2009) (holding that mother's serious criminal history, which entirely predated child's conception, was not enough by itself or in conjunction with other trial court findings—including mother's incarceration at time of termination hearing, child's bonding with foster parents, and child's need for permanency and stability—to support termination of her parental rights).

[25] Father's two violations of probation did occur much closer in time to the termination hearing. The first violation occurred when Father visited his infant daughter, who was not the subject of a CHINS proceeding, very soon after he pled guilty to child molesting. Father believed the probation condition against contact with children did not apply to his children; he was mistaken, and there is no absolute prohibition upon imposing such a probation condition upon a parent of young children who is convicted of a sex offense. *See Stott v. State*, 822 N.E.2d 176, 180 (Ind. Ct. App. 2005), *trans. denied*.[3] However, this particular

---

[3] The general statutory basis for such a probation condition is found in Indiana Code Section 35-38-2-2.4, which states:

> As a condition of probation, the court may require a sex offender (as defined in IC 11-8-8-4.5) to:

> (1) participate in a treatment program for sex offenders approved by the court; and

condition was one of a long boilerplate list of "Special Probation Conditions for Adult Sex Offenders" that Father had to agree to as part of his plea bargain. Ex. 24. DCS asked the prosecutor to modify this condition so Father could visit with his children, which indicates DCS did not think visitation with Father was a threat to his children's well-being. The prosecutor refused this request, for reasons we are not privy to, but there remains the possibility the court that imposed the condition may remove or modify it in the future. It is true that Father is not currently participating in a sex offender treatment program, which might facilitate removal or modification of this condition, but that is because the prison where he is located does not offer such treatment, not because he is refusing to do so.[4] In any event, we do not believe the existence of this probation condition provides a sufficient basis for the termination of Father's parental rights. *See Bester*, 839 N.E.2d at 153 (holding that determination by Illinois authorities that children could not be placed with father due to his

---

       (2) avoid contact with any person who is less than sixteen (16) years of age unless the probationer:

              (A) receives the court's approval; or

              (B) successfully completes the treatment program referred to in subdivision (1).

[4] Indeed, it is unclear that any DOC facility offers such a program. *See* http://www.in.gov/idoc/2799.htm (listing programs offered at DOC facilities) (last visited Oct. 12, 2017).

criminal history was irrelevant in deciding whether to terminate his parental rights).

[26] Immediately after the hearing revoking Father's probation for visiting with his daughter, while leaving the hearing and being transported to jail, he committed a second probation violation, trafficking with an inmate. Obviously, this was a grave error, and it had the effect of extending Father's incarceration. It is unclear whether his earliest release date at the moment is in June 2018 or June 2019, as there is conflicting evidence in the record and on the DOC website. In either case, the time period between the termination hearing(s) and Father's expected release—one-and-a-half or two-and-a-half years in the future—is not so extreme as to necessarily warrant termination of his parental rights. *See H.G. v. Indiana Dep't of Child Servs.*, 959 N.E.2d 272, 282 (Ind. Ct. App. 2011) (reversing termination of mother and father's parental rights where they were incarcerated and earliest expected release dates were twenty-eight and thirty-three months after termination hearing, respectively), *trans. denied*.

[27] A final factor we note here is that Father's children were in foster care with their paternal aunt at the time of the termination hearing and that she planned on adopting them if the termination was finalized.[5] The aunt had custody of the children for approximately nine of the months preceding the termination

---

[5] The aunt also had foster care of K.P., Mother's child by Stepfather, and expressed her willingness to adopt K.P. as well even though she was not related to K.P.

hearings, after their removal from Mother in November 2015.[6] Adoption by the aunt included the possibility of Father continuing to have a relationship with his children in the future. When a child is in relative placement and the permanency plan is for adoption into that home where he or she has already been living for a considerable length of time, prolonging the adoption is unlikely to negatively affect the child. *See In re Involuntary Termination of Parent-Child Relationship of R.S.*, 56 N.E.3d 625, 630 (Ind. 2016).[7] In other words, even if Father eventually fails to regain custody of his children, they will remain in the care of their aunt as they already would have been for years by that point.

[28]     The termination of one's parental rights is "'intended as a last resort, available only when all other reasonable efforts have failed.'" *Id.* (quoting *In re V.A.*, 51 N.E.3d 1140, 1151-52 (Ind. 2016)). Here, virtually no efforts have been made with respect to Father. DCS initially had no concerns about him as a parent and, so, did not offer or require him to participate in any services. Even after Father's conviction, DCS attempted to convince the prosecutor to allow him to continue having contact with his children, to no avail. Father was participating in a DCS-referred "Father Engagement" program at the jail where he initially was housed, but it was not offered at the DOC facility to which he was

---

[6] The aunt had custody of the children for six months in 2016, then allowed them to be placed in another foster home temporarily because of financial issues related to obtaining her own foster care license, then regained custody of the children at the beginning of December 2016 when those issues were resolved.

[7] The child in *R.S.* had been in relative placement for "years" prior to termination. Here, the time period involved when the children were removed from Mother's custody was only fifteen months, but the paternal aunt had custody of the children for a majority of that time.

transferred. Also, shortly after that transfer, DCS filed its petition to terminate Father's parental rights and simultaneously ceased any attempts to refer Father to additional services. Father had expressed his wish to eventually reunify with his children and wanted to know what he could do to accomplish that goal, but was barely given any opportunity to do so. The type of program that would appear to most expeditiously facilitate Father's reunion with his children—a sex offender program—is not available at the prison where he is incarcerated, which is a circumstance beyond his control.

[29] In light of all the facts and circumstances, we conclude DCS failed to prove by clear and convincing evidence that continuation of the parent-child relationship posed a threat to the well-being of Father's children. As such, we must reverse the termination of Father's parental rights to his children Ro.P. and B.P.

## Conclusion

[30] There is sufficient evidence to support the termination of Mother's parental rights to Ro.P., B.P., and K.P. However, there is insufficient evidence to support the termination of Father's parental rights to Ro.P. and B.P. We affirm the termination of Mother's parental rights but reverse the termination of Father's parental rights.

[31] Affirmed in part and reversed in part.

May, J., and Bradford, J., concur.